# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jun 12 2020, 7:43 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Karyn Price
Crown Point, Indiana

ATTORNEY FOR APPELLEE

Robert J. Henke
Deputy Attorney General
Indianapolis, Indiana

## IN THE
## COURT OF APPEALS OF INDIANA

In Re: The Termination of the Parent-Child Relationship of J.T. (Minor Child);

M.P. (Mother),

*Appellant-Respondent,*

v.

The Indiana Department of Child Services,

*Appellee-Petitioner.*

June 12, 2020

Court of Appeals Case No.
19A-JT-2457

Appeal from the Lake Superior Court

The Honorable Thomas P. Stefaniak, Jr., Judge

Trial Court Cause No.
45D06-1904-JT-120

**Pyle, Judge.**

## Statement of the Case

M.P. ("Mother") appeals the termination of the parent-child relationship with her son, J.T. ("J.T."), claiming that the Department of Child Services ("DCS") failed to prove by clear and convincing evidence that: (1) there is a reasonable probability that the conditions that resulted in J.T.'s removal or the reasons for placement outside Mother's home will not be remedied; (2) a continuation of the parent-child relationship poses a threat to J.T.'s well-being; and (3) termination of the parent-child relationship is in J.T.'s best interests. Concluding that there is sufficient evidence to support the trial court's decision to terminate the parent-child relationship, we affirm the trial court's judgment.[1]

We affirm.

## Issue

Whether there is sufficient evidence to support the termination of the parent-child relationship.

## Facts

Mother is the parent of J.T., who was born in April 2013. In June 2015, DCS was notified that Mother's ten-month-old daughter had died while in Mother's care. DCS Family Case Manager Jennifer Miller ("FCM Miller") immediately went to Mother's home to speak with Mother. FCM Miller noticed that

---

[1] The trial court also terminated Father's parental rights; however, Father is not a party to this appeal.

Mother, two-year-old J.T., and J.T.'s two older brothers were all living in a one-bedroom apartment. Mother's daughter had also lived in the home before her death. The only food in the home was a pot of rice on the stove that J.T.'s older brother had cooked the previous day. FCM Miller also noticed a broken kitchen window. The window had broken glass hanging from it, and Mother had made no effort to secure the window. Mother explained that she did not want to cut herself. In addition, FCM Miller noticed several shards of broken glass in the kitchen and living room. Some of the pieces were located very near to where the children had been sleeping. Mother admitted that she used cocaine regularly and had recently used it in the home with a friend. DCS removed J.T. and his two brothers from the home because of Mother's drug use and the conditions of the home.

[4] Two days later, DCS filed a petition alleging that J.T. was a Child in Need of Services ("CHINS"). The trial court adjudicated J.T. to be a CHINS in September 2015 and ordered Mother to: (1) complete a parenting assessment and follow all recommendations; (2) complete a substance abuse assessment and follow all recommendations; (3) complete a psychological assessment and follow all recommendations; (4) submit to random drug screens; (5) participate in supervised visitation; and (6) participate in homebased services.

[5] Nearly two years later, in June 2017, the trial court suspended Mother's visitation with J.T. because she was not complying with the CHINS dispositional order. The trial court told Mother that she could resume visitation

with J.T. after she had complied with the dispositional order for thirty days. Mother never did so.

[6] In April 2019, DCS filed a petition to terminate Mother's parental relationship with J.T. At the August 2019 termination hearing, DCS Family Case Manager Ra'Quell Mack ("FCM Mack") testified that Mother had initially completed parenting and substance abuse assessments but had not followed the assessors' recommendations. Mother had also failed to complete a psychological assessment. According to FCM Mack, Mother had tested positive for cocaine in June 2019 and three additional times that month. In addition, Mother had not seen J.T. in two years.

[7] FCM Mack further testified that Mother had just given birth to another child in July 2019. FCM had visited Mother's home following the child's birth and had noticed a white powder that looked like cocaine on a table. FCM Mack had also noticed a jar with green leaves and stems that smelled like marijuana. During the visit, Mother admitted that her infant slept on a four-foot tall changing table. Based on these conditions, and concerned for the safety of the infant, FCM filed an abuse/neglect report with DCS regarding the infant.

[8] In addition, FCM Mack testified that J.T. had been placed in a pre-adoptive foster home in April 2019 when he was six years old. According to FCM Mack, J.T. was "thriving" in foster care. (Tr. Vol. 2 at 42). FCM Mack further testified that the foster parents had a "great bond" with J.T. and had worked with J.T. over the summer so that he did not have to repeat kindergarten and

could be promoted to the first grade. (Tr. Vol. 2 at 42). FCM Mack also testified that when six-year-old J.T. had been placed with foster parents, the child was "defecating on himself." (Tr. Vol. 2 at 42). Foster parents worked with J.T. and took him to a specialist, and this issue has been resolved.

[9] When asked whether Mother was any closer to remedying the conditions that had led to J.T.'s removal four years ago, FCM Mack responded, "No. [Mother] is actually in the same spot. She is still using cocaine . . . regularly." (Tr. Vol. 2 at 44). FCM Mack also testified that termination of Mother's parental relationship with J.T. was in the child's best interests "because of the continued substance abuse with [Mother and] inconsistent housing." (Tr. Vol. 2 at 43). FCM Mack further explained that "[Mother] ha[d] not participated in the case plan. She ha[d]n't even done what she need[ed] to do for thirty days completely to get the child back or show that she want[ed] to have a relationship with the child. He hasn't seen [Mother] since -- in over two years." (Tr. Vol. 2 at 43).

[10] In September 2019, four years after J.T. had been adjudicated a CHINS, the trial court issued an order terminating Mother's parental relationship with J.T. Mother now appeals the termination.

# Decision

[11] Mother argues that there is insufficient evidence to support the termination of her parental rights. The Fourteenth Amendment to the United States Constitution protects the traditional right of parents to establish a home and

raise their children. *In re K.T.K.,* 989 N.E.2d 1225, 1230 (Ind. 2013). However, the law provides for termination of that right when parents are unwilling or unable to meet their parental responsibilities. *In re Bester*, 839 N.E.2d 143, 147 (Ind. 2005). The purpose of terminating parental rights is not to punish the parents but to protect their children. *In re L.S.,* 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), *trans. denied.*

[12] When reviewing the termination of parental rights, we will not weigh the evidence or judge the credibility of the witnesses. *K.T.K.*, 989 N.E.2d at 1229. Rather, we consider only the evidence and reasonable inferences that support the judgment. *Id.* Where a trial court has entered findings of fact and conclusions thereon, we will not set aside the trial court's findings or judgment unless clearly erroneous. *Id.* (citing Ind. Trial Rule 52(A)). In determining whether the court's decision to terminate the parent-child relationship is clearly erroneous, we review the trial court's judgment to determine whether the evidence clearly and convincingly supports the findings and the findings clearly and convincingly support the judgment. *Id.* at 1229-30.

[13] A petition to terminate parental rights must allege:

> (B) that one (1) of the following is true:
>
> > (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

(ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

(iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the child.

IND. CODE § 31-35-2-4(b)(2). DCS must prove the alleged circumstances by clear and convincing evidence. *K.T.K.,* 989 N.E.2d at 1231.

[14] Here, Mother argues that there is insufficient evidence to support the termination of her parental rights. Specifically, she contends that the evidence is insufficient to show that there is a reasonable probability that: (1) the conditions that resulted in J.T.'s removal or the reasons for placement outside the parent's home will not be remedied; and (2) a continuation of the parent-child relationship poses a threat to J.T.'s well-being.

[15] At the outset, we note that INDIANA CODE § 31-35-2-4(b)(2)(B) is written in the disjunctive. Therefore, DCS is required to establish by clear and convincing evidence only one of the three requirements of subsection (B). *In re A.K.,* 924 N.E.3d 212, 220 (Ind. Ct. App. 2010). We therefore discuss only whether there is a reasonable probability that the conditions that resulted in J.T.'s removal or the reasons for his placement outside Mother's home will not be remedied.

[16]     In determining whether the conditions that resulted in a child's removal or placement outside the home will not be remedied, we engage in a two-step analysis. *In re E.M.*, 4 N.E.2d 636, 643 (Ind. 2014). We first identify the conditions that led to removal or placement outside the home and then determine whether there is a reasonable probability that those conditions will not be remedied. *Id.* The second step requires trial courts to judge a parent's fitness at the time of the termination proceeding, taking into consideration evidence of changed conditions and balancing any recent improvements against habitual patterns of conduct to determine whether there is a substantial probability of future neglect or deprivation. *Id.* Habitual conduct may include parents' prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and a lack of adequate housing and employment. *A.D.S. v. Ind. Dep't of Child Servs.*, 987 N.E.2d 1150, 1157 (Ind. Ct. App. 2013). The trial court may also consider services offered to the parent by DCS and the parent's response to those services as evidence of whether conditions will be remedied. *Id.* Requiring trial courts to give due regard to changed conditions does not preclude them from finding that a parent's past behavior is the best predictor of her future behavior. *E.M.*, 4 N.E.3d at 643.

[17]     Here, our review of the evidence reveals that J.T. was removed from Mother's home because of Mother's cocaine use and inappropriate housing. Four years after J.T.'s removal, Mother was still using cocaine. In fact, she tested positive for cocaine three times during the month of the termination hearing. Further, although Mother had initially completed parenting and substance abuse

assessments, she had not followed the assessors' recommendation. In addition, at the time of the hearing, Mother had not seen J.T. in two years. This evidence supports the trial court's conclusion that there was a reasonable probability that the conditions that resulted in J.T.'s removal would not be remedied. We find no error.

[18] Mother also argues that there is insufficient evidence that the termination was in J.T.'s best interests. In determining whether termination of parental rights is in the best interests of a child, the trial court is required to look at the totality of the evidence. *In re D.D.*, 804 N.E.2d 258, 267 (Ind. Ct. App. 2004), *trans. denied*. In so doing, the court must subordinate the interests of the parents to those of the child involved. *Id.* Termination of the parent-child relationship is proper where the child's emotional and physical development is threatened. *In re R.S.*, 774 N.E.2d 927, 930 (Ind. Ct. App. 2002), *trans. denied*. The trial court need not wait until the child is irreversibly harmed such that his physical, mental, and social development is permanently impaired before terminating the parent-child relationship. In addition, a child's need for permanency is a central consideration in determining the child's best interests. *In re G.Y.*, 904 N.E.2d 1257, 1265 (Ind. 2009). Further, the testimony of the service providers may support a finding that termination is in the child's best interests. *McBride v. Monroe Cnty. Office of Family and Children*, 798 N.E.2d 185, 203 (Ind. Ct. App. 2003).

[19] Here, our review of the evidence reveals that FCM Mack testified that J.T. is thriving in his pre-adoptive foster family and that termination was in J.T.'s best

interests. FCM Mack's testimony, as well as the other evidence previously discussed, supports the trial court's conclusion that termination was in J.T.'s best interests.

[20] We reverse a termination of parental rights "only upon a showing of 'clear error'—that which leaves us with a definite and firm conviction that a mistake has been made." *Egly v. Blackford Cnty. Dep't of Pub. Welfare*, 592 N.E.2d 1232, 1235 (Ind. 1992). We find no such error here and therefore affirm the trial court's order.

[21] Affirmed.

Bradford, C.J., and Baker, J., concur.